**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARTRAY MCKESSON                          :

    Petitioner                               :

    v.                                       :      Civil Action No. AW-07-2461

BOBBY SHEARIN and                         :
DOUGLAS F. GANSLER

                               :

    Respondents

o0o

**MEMORANDUM**

The above-captioned Petition for Writ of Habeas Corpus was filed on September 19, 2007.  Pursuant to this Court's Order to Show Cause, Respondents have filed a response to the petition.  Paper No. 7.  Upon review of the record, the Court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2008);  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).

**Background**

Petitioner was convicted by a jury in the Circuit Court for Baltimore City of the August 3, 2000,  first-degree murder of Lamont Wyatt.   Trial began  April 30, 2003, and concluded on May 2, 2003.  Petitioner was sentenced to life, all but forty years suspended for first-degree murder and a twenty year concurrent sentence for a handgun offense.

Petitioner raised three questions on direct appeal to the Court of Special Appeals:

1.    Did the trial court judge err in overruling a defense exception to the reasonable doubt/duty to deliberate instruction given in response to a jury question?

2.    Did the trial judge err in denying a defense motion for mistrial after the prosecutor committed egregious misconduct?

3.      Did the trial judge err in refusing to admit the tape of a prior trial which was relevant to the credibility of one of the witnesses against [Petitioner]?

Paper No.1 at Ex. 2 and 3.   The intermediate appellate court affirmed Petitioner's convictions in an unreported decision issued on June 22, 2005.  The court found that the trial judge responded properly to the jury question regarding reasonable doubt by providing an instruction which mirrored the pattern jury instructions and did not lower the burden of proof.  The court also rejected Petitioner's contention that a mistrial should have been declared, finding instead that the prosecutor's arguments were based on facts admitted into evidence.  Petitioner's third ground for appeal was rejected on procedural grounds as there was no record presented to support his argument.  A petition for writ of certiorari filed with the Maryland Court of Appeals was denied on October 4, 2005.  Paper No.1 at Ex. 4.

<u>Evidence at Trial</u>

Lamont Wyatt was shot to death on August 13, 2000.  The shooting occurred at 10:30 p.m.  in the 2100 block of Barclay Street in Baltimore City.  The evidence against Petitioner consisted mainly of the testimony of two witnesses, Cierra Claridy and Garion Hagans.

When Cierra Claridy testified she claimed she did not give a statement to the police and she did not see who fired the shots that killed Wyatt.  Ms. Claridy claimed at the time of the shooting she was sitting on the steps of a house on Barclay street having her hair braided.  Paper No. 1 at Ex.7, p. 9 (May 1, 2003).  She testified that as soon as she heard the gunshots she ran into the house and called her father to come pick her up.  *Id*.  She recalled talking to Detective Cherry in December, but claimed he spoke to her only briefly and only asked her if she knew any of the men depicted in the photographic line-up.  *Id*. at p. 14.  She admitted putting her signature on two photographs.  The first photograph had the following handwritten statement on it: "I think

2

I saw number three around 24th and Barclay but I don't know his name." *Id.* at pp. 15– 16.  The second photograph, a picture of Petitioner, also had a handwritten statement which read: "The person I picked out was Trey because he was the one who got out the black car in the middle of 21st and Barclay and shot Lamont." *Id.* at p. 18.  Ms. Claridy denied writing either statement and claimed the pictures did not include those statements when she placed her signature on them.  *Id.* at pp. 22.   Ms. Claridy also claimed that during Detective Cherry's visit he began to speak to her sister in a flirtatious manner and her father asked Cherry to leave.  *Id.* at p. 26.  She claimed she was never asked by Cherry to identify who the shooter was, only if she knew Trey.  *Id.* at p. 30.

Hagans testified that he was incarcerated on the night of the shooting.  *Id.* at pp. 32 – 37.  He claimed he was told if he provided information about the homicide he would get a deal on pending charges against him.  Hagans denied making the statement taken by police indicating that he had talked to Petitioner about the shooting and Petitioner said "he did what he had to do."  Hagans said at the time he talked to police he was desperate to get out of jail to get more drugs and get high, so he was willing to lie about Petitioner.  He claimed the statements he made to police consisted of things he overheard while in jail along with statements he simply made up.  *Id.* at p. 83.  Hagans' statement to the police was tape recorded and a redacted copy of the transcript was introduced into evidence.  On cross-examination Hagans claimed that in an unrelated case where the court was informed he was cooperating in the murder investigation concerning Lamont Wyatt, he was given a lighter sentence.[1]  *Id.* at pp. 86– 87.

Forensic evidence was introduced through the testimony of the medical examiner, Dr.

---

[1] Hagans expressed his disappointment that he was required to serve any time as it was his apparent understanding that he would not be required to serve time as a reward for his cooperation.

Zemrus, who  established that Mr. Wyatt sustained a gunshot wound to the second vertebrae of his neck which caused him to immediately collapse to the ground.  *Id*. at pp. 122 – 134.  *Id*. at pp. 127– 28.  Superficial wounds to the victim's face were caused by his collapse.  There was no indication that the victim had recently fired a gun and there was no blood trail because of the victim's almost instantaneous death.

Testimony from Lisa Lewis, an employee of the Maryland Division of Correction, established that Robert Kelly was incarcerated at the time Lamont Wyatt was killed.  Robert Kelly was identified in the photographic line-up as the shooter by at least one witness.  *Id*. at pp. 134– 136.

Detective Cherry testified at trial that it came to his attention that Cierra Claridy was a potential witness to the shooting after he spoke with her sister, Symika.  Paper No. 1 at Ex. 7, pp. 159– 60.  He explained that he interviewed Ms. Claridy at her home, with her parents present and that she had been identified as a potential witness by a family member.  He testified that she told him what happened that night, and he took some notes and indicated he was interested in showing her pictures of possible suspects.  *Id*. at p. 162.  He testified that her father was concerned about his daughter's safety because she was still in school and he thought she might be in jeopardy for providing evidence.  *Id*. at pp. 162– 63.  Detective Cherry explained that Ms. Claridy told him and another detective that she was sitting on the steps of 2104 Barclay with the victim, Jamal Jones, Earl Wyatt and other girls when a car pulled up and a man got out of the car.  *Id*. at p. 164.  He said Ms. Claridy told him that Lamont Wyatt took off running north towards East 22nd street and the man who got out of the car, whom she identified as Martray McKesson, began shooting in his direction.  *Id*.  Detective Cherry further testified that Ms.

4

Claridy said when the shooting began everyone else ran into the house.  *Id*.  She told him three shots were fired in the victim's direction. *Id*. at pp. 164– 65.   Finally, Detective Cherry described the tone of the meeting with the Claridys as good.  He testified that at the time of the interview another man, Robert Kelly, was suspected as the shooter and there was nothing threatening about the meeting inasmuch as Ms. Claridy had done nothing wrong.  *Id*. at p. 166 – 67.

Detective Cherry explained that Ms. Claridy was provided two photographic line-ups, one containing Robert Kelly's picture and one containing Petitioner's picture.  *Id*. at pp. 170– 71.  He testified that she did not identify Robert Kelly as being present the night of the shooting, but did identify Martray McKesson as the man she knew as Trey and who did the shooting. *Id*.  at p. 171.  Detective Cherry testified that she identified Petitioner's photograph "almost without hesitation."  *Id*.   He further testified that he witnessed Ms. Claridy writing the following statement on the back of the photographic array: "'the person I picked out was Trey because he was the one who got out a black car in the middle of 21st and Barclay and shoot (sic)Lamont.'"  *Id*.  at p. 172.

Cherry also testified about another interview he conducted with Garion Hagans.  *Id*. at p. 175.  Hagans had called the police station claiming he had information about the shooting.  At the time of the shooting, Hagans was in jail and when he was released he claimed he ran into Petitioner and spoke with him about the murder.  *Id*. pp. 178– 95.  Hagans explained he talked to Petitioner four months after the shooting and Petitioner told him 'I did what I had to do.'  Hagans claims he asked Petitioner if he was talking about the shooting around Barclay and Petitioner confirmed that he was.  Hagans also claimed he asked Petitioner if the victim had robbed him

and Petitioner stated that he had.  Cherry asked Hagans if he got high and Hagans said that he

uses heroin but could not recall if he was high at the time he talked to Petitioner.  Hagans was

shown a photographic line-up during his interview with Cherry and  identified Petitioner's

picture as the man he knew as Tray.  *Id*. at p. 196.

On cross-examination, Cherry was questioned about other witnesses who came forward

during the investigation.  *Id*. at pp. 202– 218.  One witness, Larry Hall, was the first to come

forward and described the shooter as 5 feet 8 inches tall, stocky and brown skinned. *Id*. at p. 203.

 Cherry further testified on cross that he believed that the victim's brother, Earl Wyatt, saw

Petitioner shoot Lamont.  When Earl Wyatt was presented with a photographic array, however,

he did not identify Petitioner as the shooter; rather he picked a photograph of Robert Kelly,

identified him as Tray, and denied witnessing the shooting of his brother.  *Id*. at p. 206.  Mr.

Kelly was identified as the shooter in a photographic array by, Ms. Gaymon, who said she

witnessed the shooting.[2]  *Id*. at p. 207.   The cross-examination included questions about other

variances in descriptions of the shooter and the car that was driven.  *Id*. at pp. 213– 218.  In

addition, defense counsel impeached Hagans' character by introducing evidence that he had

eleven different aliases as well as a felony record.  *Id*. at pp. 224– 25.

Cherry claimed that Cierra Claridy approached him one year before the trial and told him

she still knew Petitioner was the shooter.  *Id*. at p. 240.  He claimed she said she felt she was

being influenced by her father and others not to testify.  He said he told her she had a duty to

---

[2] Ms. Gaymon alleged she was in jail with the shooter she identified; however, a check of the records did not establish that she was incarcerated at the same time Robert Kelly was incarcerated.  Paper No. 1 at Ex. 7, p. 246– 7.  Based in part on that lack of corroboration, Detective Cherry did not believe Ms. Gaymon's identification of Robert Kelly as the shooter was credible.

testify honestly and that any threats made against her or her family should be reported to the police.  Ms. Claridy denied receiving any threats.

The defense presented two witnesses, Natasha Moody and Charles Claridy .  Paper No. 1 at Ex. 7 (May 2, 2003).   Natasha Moody was the public defender who represented Hagans in an unrelated criminal case.  *id*. at pp. 17 − 24.  She testified that at sentencing it was reported to the court that Hagans had cooperated with the police in obtaining a search and seizure warrant as well as providing information on a homicide case in an effort to obtain a lenient sentence.  *Id*.  at p. 19.  Ms. Moody testified under cross-examination that Hagans' cooperation in the homicide case was presented to the court by the State's Attorney during sentencing proceedings.  *Id*. at p. 23.  In addition she stated that the sentence ultimately imposed was for less time than the State was seeking.  *Id*. at p. 19.

Charles Claridy , Cierra Claridy's father, testified about the meeting between Cierra and Detectives Cherry and Benson at his house on December 13th, claiming the detectives did not ask his daughter if she saw the shooting, only if she knew any of the men depicted in the photographic line-up.  *Id*. at p.28.  He further testified that his daughter said she knew Petitioner, that her signature and his signature were on the picture, but the other writing on the photograph was not there when they signed their names.  *Id*. at p. 29.   He claimed the writing was not his or his daughter's handwriting.  *Id*.  He claimed he had never been threatened or bribed and was not afraid of Petitioner.  Claridy said he had been telling the police for two years that his daughter had not witnessed the murder, but they continued to approach him about it despite his protests.  *Id*. at pp. 30− 31.  He claimed the States Attorney, Mr. Rafter, also approached him about his daughter testifying against Petitioner, but he repeated that his daughter had not witnessed the

crime.  *Id*.  Claridy claimed his daughter told him that she had her head down when the shooting occurred and that it happened very quickly so she didn't see anything.  *Id*.  He further claimed that he told the officers to leave his house during the interview.  *Id*. at p. 32.  On cross-examination Claridy denied saying he was threatened or that he did not want his daughter to testify because she had to live in the neighborhood where the shooting occurred.

As a rebuttal witness to Claridy's testimony, the state recalled Detective Cherry to the stand.  *Id*. at pp. 58– 66.  Cherry testified that during the meeting with Cierra and her father, Mr. Claridy never said that his daughter did not witness the murder; rather, he voiced concerns about her safety if she testified in a murder trial.  *Id*. at p.61.  Cherry said an offer was made to move the family to another location or to enter a witness protection program, but Claridy declined.  *Id*.  When Cherry asked Claridy if he had received any direct threats regarding this case he denied having received any.  *Id*.  On cross-examination Cherry denied ever being told to leave the Claridy house, but confirmed that despite his assertions there was concern for Cierra's safety the family never moved from their house and Cierra's identity was known to the defense.  *Id*. at p. 63.

During deliberations the jury asked to see a letter used during Mr. Claridy's cross-examination that was allegedly sent to him by the State's Attorney.  The letter was never admitted into evidence because Claridy denied ever receiving it.  The jury was told, over defense objection, that they had all the evidence they were going to get and their decision must be based on the evidence.  *Id*. at pp. 103– 105.  Defense counsel argued that the jury should be told the letter was not admitted into evidence and it therefore may not be considered during deliberations.  *Id*. at p. 107.

A second question received from the jury asked for the court's definition of reasonable doubt.  *Id*. at p. 108.  The judge determined the question required him to re-instruct the jury on the burden of proof and their duty to deliberate.  *Id*.  The judge read the same reasonable doubt instruction to the jury, but also gave the following instruction to which defense counsel objected:

> During deliberations, do not hesitate to re-examine your own views.  You should change your opinion if you're convinced that you're wrong; if you're satisfied, in other words, that the other side, if there's more than one side, as there does seem to be on one or more issues, if you're satisfied that the other side is more reasonable than yours, you're required to go along, not just to hold out to hold out.  But at the same time, if you're not satisfied that the other side is more reasonable than yours, you're not required to go along just simply to reach a verdict.  You should change your opinion, in other words, if you're convince that you're wrong. But do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for simply the purpose of reaching a verdict.

*Id*. at pp. 111– 12.

Approximately thirty minutes later the jury returned a guilty verdict.  *Id*. at pp. 113– 14.

<u>Post Conviction</u>

On post-conviction review, Petitioner claimed defense counsel was ineffective when he: failed to object to opinion testimony by Detective Cherry; failed to object when Cherry provided inadmissible witness-bolstering testimony; elicited inadmissible hearsay evidence from Cherry; and failed to object to the prosecuting attorney's assertion of personal facts not in evidence during cross-examination.  Specifically Petitioner alleged that trial counsel should have objected to the following testimony by Detective Cherry.

> Question:  But in this particular case, you had information that Earl Wyatt was outside when the shooting took place?  According to what you read from the report.

> Answer: I had information later on. It's still my belief, Mr. Daneman.  I'm not going to sit here and not even tell the jury, I will tell the jury that it's still my belief that Earl Wyatt saw Trey shoot his brother.

Paper No. 1, May 1, 2003 at p. 205.

> Question: In other words, these are only descriptions, that I provided, that I wrote?  These are the only ones that exist?  Is that what you're telling me?

> Answer:  There are descriptions, descriptions will change, Mr. Daneman.  Even today, with Martray Mckesson sitting next to you, if all of us would leave the room and say come in here and describe him , we still may give different descriptions.  I don't know, if you went back to Larry Hall he may say he's 5'9", stocky, so I'm not going to sit here and tell the Court that there are no more descriptions to add to that board.  What I know is that the person that killed Lamont Wyatt is sitting next to you.

*Id*. at p. 250.

> Question:  If I told you [Cierra Claridy] testified, under oath, that she never printed those words, what would you say about that?

> Answer: She's lying.
> Question:  But you just told me she's a believably credible witness.

> Answer:  I still believe Cierra is a credible witness.  But what she saw that night . . . was that Martray McKesson shot Lamont Wyatt.

*Id*. at p. 242.

> Question: Did you ever have conversations with Mr. Claridy in the Clarence Mitchell Courthouse?
> Answer: Yes.
> Question: And didn't he argue with you in the hallway about leave my daughter alone, she did not see the shooting?
> Answer: No.
> Question: Never heard those words did you?
> Answer: No.
> Question:  I see.  When was the first time you heard these magical words?
> Answer:  I don't recall . .. I don't recall them ever saying, my daughter didn't see the shooting . . .

* * * * *

> I still don't recall  [Mr. Claridy] telling me Cierra did not see the
> shooting . . . There is no reason for [Cierra Claridy] to lie . . . She
> was out there that night when Martray shot Lamont.  She saw it;
> she's a young girl, she didn't want to testify.  Her father didn't
> want her to testify.  That's what I'm testifying to, and it's the truth.

*Id*. at May 2, 2003, p. 63—65.

> Question: Has Cierra Claridy ever recanted her testimony?

> Answer: No.  As a matter of fact, she came to me a little over a
> year ago in the room downstairs where they serve food downstairs,
> in the canteen on the second floor and . . . at that time she indicated
> to me that she still knows Trey did the shooting.

*Id*. at May 1, 2003, pp. 239—40.

 At a hearing on the merits Petitioner's trial counsel maintained his failure to object to the

above testimony was part of his trial strategy.  Paper No. 7 at Ex. 5.  Counsel maintained that

Detective Cherry's testimony identifying Petitioner as the shooter would be impeached by the

testimony of other witnesses as well as evidence that multiple descriptions of the shooter did not

match Petitioner's appearance.  In addition counsel knew another man, Robert Kelly, had been

identified as the shooter by both Earl Wyatt and another witness.  In cross-examining Detective

Cherry counsel established that varied descriptions had been provided of the shooter and that he

was aware that Mr. Kelly had been identified as the shooter.

With respect to Detective Cherry's statements attempting to bolster Cierra Claridy's

testimony, counsel maintained that the testimony was helpful to the defense.  He explained that

Cherry's statements that Cierra was a credible witness were contradicted by his claim that she

had lied on the stand when she denied signing the photographic line-up.

With respect to Cherry's claim on the stand that Cierra had never recanted and had in fact

restated her belief that Petitioner was the shooter, counsel claimed he did not object to the hearsay portion of the testimony because he wanted to use the testimony to impeach Cherry. He claimed at the time he was prepared to put Cierra's father on the stand who would testify that he had told Cherry his daughter never saw the shooting. In addition counsel stated he had sent a letter to the prosecution before trial which stated that Cierra informed counsel she had not seen the shooting and had not written the statement on the photographic line up.    Counsel also claimed he included a handwriting examplar with his letter for comparison with the printed statement. [3]

In addition to the failure to object to testimony by Detective Cherry, Petitioner also claimed that trial counsel was ineffective for failing to object during the prosecution's cross-examination of Charles Claridy. Specifically, Petitioner alleged counsel should have objected when the prosecutor began asking questions about his  meeting  with Mr. Claridy and Detective Cherry. Paper No. 1, Ex. 7 (May 2, 2003) at pp. 36—47.   Petitioner claimed the prosecutor asserted facts not in evidence by referring to events he personally witnessed. Counsel testified at the post-conviction hearing that he did not object to the testimony because he knew Mr. Claridy's testimony would contradict Cherry's testimony. Counsel's strategy was to pit the credibility of the Claridys against that of Cherry and couple it with the diverse witness descriptions to create a reasonable doubt. In fact Mr. Claridy did contradict Cherry's testimony when he testified that he told Cherry prior to trial in a conversation at his house that Cierra did not see the shooting. Cherry had testified that he had never been informed before trial that Cierra had not seen the shooting.

---

3  Counsel admitted during questioning by Petitioner's post-conviction counsel that he could have called a

Finally, Petitioner alleged that even if any one of the asserted errors were not enough to find counsel ineffective, the cumulative effect of those errors rendered counsel ineffective.  In a decision dated March 30, 2006, the petition for post-conviction relief was denied.  Paper No. 1 at Ex. 4.  On December 29, 2006, the Court of Special Appeals summarily denied Petitioner's application for leave to appeal the post-conviction denial.  *Id*. at Ex. 6.

Claims in this Court

Petitioner alleges in this Court that he was denied a fair trial and his right to counsel when trial counsel: (1)  failed to object to inadmissible and prejudicial opinion testimony of Detective Cherry that Petitioner was guilty; (2) failed to object to the opinion testimony of Detective Cherry that Cierra Claridy saw Petitioner shoot Lamont Wyatt but recanted due to pressure from her father; (3) failed to object to Detective Cherry's testimony that Cierra told reaffirmed her identification of Petitioner one year prior to trial; and (4) failed to object to the prosecutor's assertion of perceived personal knowledge of facts during his cross-examination of Charles Claridy.  Paper No. 1 at p. 16.

Standard of Review

The instant petition is subject to the provisions of the federal habeas statute, 28 U.S.C. §2254, as amended.  In order to obtain relief on his ineffectiveness claims, Petitioner must show that  the adjudication of such claims at the state court level:

> (1)       resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable etermination of the facts in light of the evidence presented in the State

---

handwriting expert as a witness, but failed to do so.

court proceeding.

28 U.S.C. § 2254(d) (Supp.1997).  Furthermore:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1).

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[ now § 2254(e)(1)]." *Id*. at 698.  Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e) (1)], ... both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.*  It follows, then, that § 2254(d)(1) applies to the state court's conclusion that Petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding. *See Bell v. Jarvis*, 236 F. 3d 149, 160 (4th Cir. 2000) ( "de novo, independent, or plenary review of state court adjudications is no longer appropriate" after passage of AEDPA).

A determination need not be made concerning counsel's performance if it is clear that no prejudice would have resulted had the attorney been deficient.  *Id*. at 697.  In addition, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689.  In the context of a § 2254 proceeding, a

14

petitioner must show more than the *Strickland* test is satisfied.  *See Bell v. Cone*, 535 U.S. 695, 698-99 (2005).  The petitioner must also show that the state court applied *Strickland* to the facts of the case in an objectively unreasonable manner.  *Id*.

<u>Analysis</u>

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors.  *Id*.  at 696.

Petitioner's first claim is that counsel should have objected when Detective Cherry made statements during his testimony regarding his belief that Petitioner was guilty.  Specifically, Cherry made the following statements during his testimony:  "I will tell the jury that it's still my belief that Earl Wyatt saw Trey shoot his brother."  Paper No. 1 at Ex. 7 (May 1, 2003) at p. 205; "what she [Cierra Claridy] saw that night when she was sitting on the steps . . . was that Martray McKesson shot Lamont Wyatt."  *Id*. at p. 242; and "what I know is that the person that killed Lamont Wyatt is sitting next to you."  *Id*. at p. 250.  Paper No. 1 at p. 17.  Petitioner asserts that Cherry was not testifying as an expert; thus, his opinion testimony was only admissible as lay testimony.  Under Maryland Rule 5-701, as well as Fed. R. Evid. 701, the lay witness's opinion testimony must be rationally based on his or her perception.  Petitioner claims that Cherry's

testimony regarding his opinion of his guilt was speculative opinion testimony that was

inadmissible and damaging to his right to receive a fair trial.  Petitioner concludes that trial

counsel should have objected to the testimony.

In analyzing Petitioner's claims, the post-conviction court first recognized that "[i]t is

always necessary to consider the context in which the alleged deficient act arose.  The law

provides that if trial counsel has a sound tactical reason for his action, a court may not deem the

action deficient."  Paper No. 1 at Ex. 4, p. 3,  *citing State v. Matthews*, 58 Md. App. 243 (1984).

The court went on to note that counsel testified at the post-conviction hearing that he did not

object to Cherry's opinion statements because he wanted to use the statements to impeach the

detective's credibility.  *Id*. at p. 6.  Counsel explained that he knew the statements made were not

truthful and would be contradicted by other testimony.  There were multiple descriptions of the

shooter, none of which matched Petitioner, and another man had been specifically identified by

one witness.  In an effort to impeach Detective Cherry, counsel brought out these factors during

cross-examination.  Counsel testified that he believed the jury would then conclude Cherry was

not credible because he made these statements even though he was aware of the conflicting,

problematic evidence identifying Petitioner as the shooter.  The post-conviction court concluded

that the failure to object was in fact part of a sound trial strategy.  This court finds no error in the

post-conviction court's analysis and concludes it to be a reasonable application of well-settled

law to the facts.

Petitioner's second claim of ineffective assistance of counsel relates to trial counsel's

failure to object to Detective Cherry's testimony that

There is no reason for [Cierra Claridy] to lie . . . She was out there
that night when Martray shot Lamont.  She saw it; she's a young

> girl, she didn't want to testify.  Her father didn't want her to
> testify. That's what I'm testifying to, and it's the truth.

Paper No. 1 at Ex. 7, May 2, 2003, p. 63—65.

Petitioner asserts that this testimony was improper bolstering of the out-of-court identification made by Ms. Claridy, stated as the unequivocal truth.  He further claims the testimony intruded on the jury's exclusive domain of determining witness credibility.  Paper No. 1 at pp. 20—22.

At the post-conviction hearing counsel testified that he believed he could use this statement for impeachment purposes to show that Cherry was not credible because his testimony was inconsistent with an earlier statement he made that she had lied on the stand.  Counsel stated that Cherry made inconsistent statements regarding Cierra's credibility during the trial and he did not object because the inconsistencies helped his strategy.  In addressing this claim the post-conviction court found the failure to object, move to strike, or request a curative instruction was not ineffective assistance of counsel; rather, it was sound trial strategy.  This court finds no error in the post-conviction court's analysis.

Petitioner's third claim concerns another statement by Detective Cherry to which trial counsel failed to object.  Cherry was asked during cross-examination whether Cierra Claridy had ever recanted her identification of Petitioner prior to trial.  He responded,

> No.  As a matter of fact, she came to me a little over a year ago in
> the room downstairs where they serve food downstairs, in the
> canteen on the second floor and . . . at that time she indicated to me
> that she still knows Trey did the shooting.

Paper No. 1, at Ex. 7, May 1, 2003, pp. 239—40.

Petitioner asserts this statement is hearsay not fitting within any exception that had "the

potentially devastating effect of persuading the jury that Ms. Claridy's testimony as to lack of knowledge of the shooter's identity was untrue." Paper No. 1 at p. 22. Petitioner acknowledges that the alleged statement made by Ms. Claridy could have come in if the State had confronted her with it during its direct examination of her. Had she denied the statement, Detective Cherry could have testified to his recollection; however, the State did not elect to pursue this line of questioning with Ms. Claridy. *Id*. at p. 23. Petitioner asserts that counsel's performance was ineffective and obviated the need for the State to put on evidence concerning the alleged conversation.

In addressing this claim the post-conviction court noted counsel's testimony from the post-conviction hearing that he believed the statement in question could be used to successfully discredit or impeach Cherry's testimony. Paper No. 1 at Ex. 4, p. 12. Counsel explained that he knew at the time Cherry made the statement that Mr. Claridy would testify that he told Cherry his daughter never saw the shooting, and that counsel sent a letter to the prosecution stating that Ms. Claridy told trial counsel that she had not seen the shooting and had not written the statement on the photographic array. *Id.* Counsel highlighted the inconsistency in closing argument, showing that Cherry was lying and was not a credible witness. Paper No. 1, Ex. 7 (May 2, 2003) at pp 85 – 95. The post-conviction court concluded that the use of the statement for impeachment purposes was a part of counsel's trial strategy and was not ineffective assistance of counsel. This Court finds no error in the analysis.

Petitioner's fourth claim concerns the prosecutor's cross-examination of Mr. Claridy when the prosecutor asked about a meeting he had with Mr. Clairdy and Detectives Sanders and Cherry. Paper No. 1 at p. 23. The prosecutor asked Claridy if he recalled the meeting and

expressing his fear that his daughter's testimony as a witness in the trial may pose to his family. Claridy denied the meeting took place.  The prosecutor also referenced this testimony in closing when he said, "[y]ou saw him on the stand, ladies and gentlemen, flat-out denying that there was ever a second meeting with myself, Detective Cherry, Detective Sanders and him at his house.  It is simply not the truth."  Paper No. 1 at Ex. 7 (May 2, 2003), p. 99.   Petitioner claims the form of the prosecutor's question violated his Sixth Amendment right to be confronted with the witnesses against him, inasmuch as he could not cross examine the prosecutor regarding the alleged meeting.  He further alleges that the question was improper because it violated the advocate-witness rule prohibiting an attorney from appearing as both a witness and an advocate in the same litigation.  In so doing, Petitioner asserts, the prosecutor's insinuation that he had personal knowledge of Claridy's motive to influence his daughter to lie on the witness stand carried great weight since he is the representative of the state, carrying with his suggestion the implied endorsement of his official position.  Paper No. 1 at pp. 28—29.  Petitioner claims the error was exacerbated by counsel's failure to object.  *Id*.

At the post-conviction hearing counsel testified that he did not object to the prosecutor's question because Claridy's answer to the question was that he had told Detective Cherry that his daughter had not witnessed the shooting, contradicting the prosecutor's assertion that Cierra did not recant until the eve of trial.  Paper No. 1, Ex. 7 (May 2, 2003) at p. 37.  Claridy's testimony contradicted Cherry's testimony and, counsel maintained, bolstered his trial strategy of pitting the two witnesses' credibility against each other.  Thus, the post-conviction court concluded,  his failure to object was part of his trial strategy and was not a basis for a finding of ineffective assistance of counsel.

The Sixth Amendment "guarantees a defendant's right to confront those 'who bear testimony' against him.  A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or . . . the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S. Ct. 2527, 2531 (2009), *citing Crawford v. Waxhington*, 541 U.S. 36, 51 (2004).  The Supreme Court defined testimony as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford* 541 U.S. at  51.

Petitioner's Sixth Amendment right of confrontation claim was addressed by the Maryland Court of Special Appeals.  It determined that the prosecutor's statements were not assertions based on his personal knowledge, but instead based on Detective Cherry's testimony that he went with the prosecutor and Detective Sanders to Claridy's house where he expressed fear for his daughter's safety.  Paper No. 1 at Ex. 1, p. 30.  The appellate court  observed:

> While the prosecutor had met Charles Claridy prior to trial, the closing argument was properly based only on Detective Cherry's testimony during the State's case in rebuttal and not on the prosecutor's personal knowledge.  Detective Cherry testified that on June 5, 2002, he and Detective Sanders took the prosecutor to the Claridy's house to meet Mr. Claridy and his daughter.  According to Detective Cherry, at that time, Mr. Claridy was concerned for his daughter's safety.
>
> In his closing argument, the prosecutor offered an explanation, deducible from the evidence, of why the eyewitness, Cierra Claridy, had repudiated her first story to the police in which she identified McKesson as the gunman who had killed Lamont Wyatt.  This was proper argument of an inference drawn from the facts produced at trial.
>
> The prosecutor's argument that Mr. Claridy told his daughter to lie was a reasonable and legitimate inference from Detective  Cherry's testimony.  The court did not abuse its discretion in denying the motion for a mistrial.

*Id.* at pp. 30—31.

The court's analysis is based on a reasonable determination of the facts as well as a sound application of law to the facts.  The fourth claim does not state a basis for federal habeas relief.

## <u>Conclusion</u>

Upon review of the record, this Court determines that Petitioner is not entitled to federal habeas relief.  There is no basis upon which to find constitutional deficiencies in the state court proceedings, Petitioner having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief.   Accordingly, the Petition shall be dismissed with prejudice by separate Order which follows.

 Date:  September 1, 2009


_____/s/_____
Alexander Williams, Jr.
United States District Judge